Good afternoon, your honors. My name is Michael Mayhey on behalf of Harrah's Casino. The issue in this case is whether the commission's decision was against the manifest weight of the evidence, finding that the petitioner's cervical and back conditions were related to an accident date of November 19, 2008. Initially, the application was filed with an accident date of May 21, 2008, which was the last date that the petitioner actually worked for Harrah's. The petitioner went to the doctor the next day, and on May 22, Dr. Higgins complained of vertigo sensation since 2 a.m. that morning. And at that time, she was not working for Harrah's. She continued to treat with Dr. Higgins, then referred her to Dr. Simon, and she continued to treat with Dr. Simon throughout June. She received therapy in July. She saw Dr. Simon again in August of 08, all dealing with migraine headaches and vertigo sensation. The therapy was specifically for the vertigo. The petitioner Let me ask you a candid question just to summarize, make sure I have everything correct here. It's my understanding, and I think the debate has found this, that with the exception of Dr. Lieber, all of the doctors and all of the medical evidence supported the claim. Is that correct? That's correct in what the commission said. I think you need to look at, and counsel in his brief also argues that all the doctors except for Dr. Lieber found causal connection between the back neck and her work condition. Well, they found it, but I think the evidence that they had in making that decision was flawed. Because if you look at the histories given to almost every one of those doctors, all of those doctors, they all are basing that decision on the premise that the cervical and low back complaints were from May of 2008, the last date she worked for us. All the initial histories talk about the complaints going back to May of 2008, the last date she worked for us. The reality is those complaints don't appear at all until arguably October of 2008 with Dr. Simon when he at that point talks about having a chronic headache and migraine sensation in the front of her head and neck. The petitioner is, her FMLA runs out on November 18th of 2008. On November 19th of 2008, she is in to see Dr. Salman, S-A-L-M-A-N, and he says even in that initial report from him that she's experiencing neck and low back pain, I'm paraphrasing, but neck and low back pain since 5-22 while working. As a casino dealer. Again, that's not true. There is nothing in any of the medical records between May and October of 2008 that even remotely talks about neck, back, low back, mid back pain. It's all headache and cervical. And so when the commission says that the doctors are found causal connection, and even our Dr. Ahn agreed that there's causal connection between the medical records and the medical records. Between the cervical, back, and her work accident, he notes that it all began since 2008, or since May of 2008. What was her testimony? What did she testify to the claimant about her neck and back pain and so forth? She testified the same way. Same thing as the doctors noted in their histories. But the fact is, Your Honor, she testified at the time of trial. Initially when she was seen by the doctors in May of 2008, she didn't tell anybody about neck and back. She only told them about headache and vertigo. And the commission found her credible. The commission did find her credible. But the point is that when you look at the records, there's no corroborating evidence to support her testimony that these treatments, these complaints relate back to May of 2008. Well, what about this? Isn't it possible that, you know, if you have headaches or you have vertigo, it could be stemming from another underlying condition that she's not aware of the cause of the condition? Arguably it's possible. But there is no doctor that says that. In June of 2008. Nobody testified that this vertigo and disease could be connected to back problems. That's not in the record anymore? The only one that testified to that is Dr. Koh. That's what I thought. Right. The only one that testified to that. Who is there? Do they need more than that? Well, that's their IME. When you look at Dr. Koh up against the totality of the evidence, all the treating doctors, I think you do need more than that. I think that... The treating doctors just kept on saying, agreed with Koh that it is caused by the neck. The treating doctors said that the shoulder and the neck were related because she had complaints back as far as May 2008. And that's not true. That's not documented in any place anywhere. But that's your theory for why it's against the manifest way to be evidence. Yes. And so there must be other cases that support that theory? Those cases, Your Honor, are not cited in my brief. Well, there are no cases cited in your brief. You didn't cite a single authority in your argument to support your argument. So what should we make of that? That, Your Honor, all I can do at this point is apologize for that. There's no explanation that I can give you for that that is going to be satisfactory. You realize you could forfeit your entire argument. I do realize that. Your opponent is going to ask us to do that. And he may. So the question becomes why shouldn't we? I'm sorry, Your Honor? The question is why shouldn't we? There's no reason why you should or shouldn't. That's a decision that certainly you have every right and obligation to make. And I don't have an answer for that question that would satisfy this Court. I have one internally in my office. I don't have one here. Maybe that's your best answer. That's the only answer I can give you on that. But I would ask you to not penalize my client for a poorly written brief. And I would ask you to take a look at the medical closely. And, again, although all the doctors do find causal connection with the neck and low back, they're coming at it from a premise that those complaints were consistent from the very beginning, and they're not. So I would ask you that you overturn the commission's decision and find that there was no accident proof. Thank you. Thank you, Counsel. Counsel, you may respond. Thank you. Good afternoon, Your Honors. Michael Block for Ms. Ferguson. And I'll try to rebrief since my opponent was briefed. And to be honest with you, I've never had a situation like this with a brief, so it's kind of new to me too. It's difficult to actually respond to a brief that just says here's a few facts and we want you to reverse the case. And then I've got to file a brief that lays out everything, which we tried to do with the appropriate cases and go from there. Her testimony actually was that her problems with the neck and back began in 2007, even before, while she was working at Harris. This is a lady, she started working there when she was 22 years old. She was a very young 36 at the time of this hearing, and she had been a 14- or 15-year employee. And because it's not an issue, I won't go into all the repetitive upper extremity and activities with the neck she had to do handling a horseshoe type of table, but the evidence is overwhelming that she had extensive repetitive type motions on a daily basis for 14 to 15 years. If you will, what happened in this case then is May 21st, she wakes up at 2 a.m. with vertigo and headaches. And she goes to see her general practitioner, Dr. Higgins. Now, while Dr. Higgins doesn't note neck problems in his records initially, the therapist at Accelerated, and she started with Accelerated June 19th of 08, so that's about two or three weeks later, does, as a matter of fact, they're moving the neck, and that relates to the vertical headaches. So the therapist is seeing, but the general practitioner really isn't. At one stage, though, she does ask Dr. Higgins, this is in the plaintiff's reply brief, a phone call from physical therapy wants to know if neck problem related. And that means, of course, related to the vertigo and headaches. And the general practitioner says no, and my client testified he told her he couldn't relate the headaches and the vertigo to the neck problem. So that's why there was this delay, if you will, in putting two and two together. But Dr. Simon, the neurologist, basically rules out all the other causes, and then he finally realizes it's the neck. He does an EMG on her after about three or four months. It's positive for chronic cervical and lumbar radiculopathy. Sends her to a Dr. Salmon, who's a pain doctor, for a shot in the neck, and that's November 19th, and that's when she asks Dr. Salmon. And while his record doesn't say Iopine causal connection, it is loaded with historical events about her work activities and that. And he tells her by her testimony, yeah, your neck and your vertigo and headaches are all related and from work. Whereupon she immediately goes to the human resources and workers' comp people because she's running out of time and afraid of being terminated. And saying, look, it's work-related, you shouldn't terminate me. And the workers' comp person says it doesn't matter, basically. So we have that under play, too, but that's what's going on with the case. So then after the ‑‑ Is the record show the cause of termination, or is it inferred lower productivity at the table? I think it's pretty clear that she's running out of her time, that she can be off work. I mean, she's way beyond the 12 weeks of FMLA at the time of termination. Both by her testimony and the documents, I think that is pretty clear that that's in there. So Harris has a neutral absenteeism policy, is that the deal? And they say, well, it doesn't matter why you're gone. Well, it's neutral, except they do have the right to extend it, of course. And as a matter of fact, at this time, the time all this is going on, she's not really ‑‑ she is and isn't terminated because they also have an appellate process and she's in the middle of the appellate process. My only point is that's the stated reason is their absenteeism policy. Yes, they do have an absenteeism policy like every employer does, except for our office probably. But, yes, they do have an absenteeism policy. Be careful, it's being recorded. You're right, Your Honor. So in any event, it is in early. Actually, the people that really had the handle on this, the best handle on this, were Dr. Koh and Dr. Ahn because they had all the records as opposed to individual doctors that are putting pieces together. Both of them agree that there's causal connection to the work activities. Dr. Koh said the headaches and vertigo as well were related. Dr. Simon, in his records, is a neurologist found near from the neck because he sent her for a neck shot and then the headaches and vertigo went away. So in some way you're saying there's sufficient evidence in the records to oppose the decision, is that what you're saying? I think there's more than sufficient evidence. I think Your Honors have the picture. So unless you have any more questions, I wish you a good day. Thank you. Thank you, counsel, both, for your arguments. This matter will be taken under advisement. Disposition shall issue, although you do have rebuttal. Would you like to exercise your reply time? I wait, Your Honor. Are you sure? Okay, you have five minutes. All right. Thank you, counsel, both. Okay. The court will stand in brief recess.